United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

MUNIS GHANNI ABSYED,

       Plaintiff,

v.

NANCY A. BERRYHILL,

       Defendant.

Case No.  15-cv-02328-LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

ECF Nos. 23 & 26

**INTRODUCTION**

Plaintiff Munis Ghanni Absyed moves for summary judgment, seeking judicial review of the Social Security Administration's final decision denying him disability benefits.[1] The Administrative Law Judge ("ALJ") found that Mr. Absyed had the following severe impairments: multi-level DDD (including advanced canal stenosis C3-T1); cirrhosis; hepatitis C; and a history of thrombocytopenia (with no history of transfusions), but held that he was not disabled and did not qualify for Social Security Disability Insurance ("SSDI") benefits.[2] The Commissioner opposes Mr. Absyed's motion for summary judgment and cross-moves for summary judgment.[3]

---

[1] Motion for Summary – ECF No. 23. Record citations refer to the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] AR 23–31. Administrative Record ("AR") citations refer to the page numbers in the bottom right hand corner of the Administrative Record.

[3] Cross-Motion for Summary Judgment – ECF No. 26.

Under Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. All parties have consented to magistrate jurisdiction.[4] The court grants Mr. Absyed's motion and denies the Commissioner's cross-motion on the grounds that the ALJ erred by (1) failing to properly weigh the opinion of Mr. Absyed's treating physician Dr. Man, and (2) improperly discrediting Mr. Absyed's testimony. The court remands for further proceedings.

## STATEMENT

### 1.  Procedural History

Mr. Absyed filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income, alleging disability beginning on March 18, 2011.[5] The Social Security Administration ("SSA") denied his claim on the ground that Mr. Absyed's impairments were not severe enough to keep him from working.[6]

Mr. Absyed timely appealed the SSA's decision and filed a request for reconsideration.[7] The SSA denied the reconsideration request.[8] Mr. Absyed timely appealed the SSA's reconsideration decision and requested a hearing before the ALJ.[9] The ALJ held the hearing on May 22, 2014, in San Jose, California.[10] Mr. Absyed and ALJ Christopher R. Inama attended the hearing; Mr. Absyed's attorney Jeffrey Milam and vocation expert ("VE") Linda Ferra appeared by telephone.[11] The ALJ addressed the issues of whether Mr. Absyed met the SSA's definition of "disabled" and also whether Mr. Absyed was disabled within the applicable disability period of

United States District Court
Northern District of California

---

[4] Consent Forms – ECF Nos. 8, 10.

[5] AR 169, 176.

[6] AR 21, 137.

[7] AR 143.

[8] AR 21, 145.

[9] AR 21, 152.

[10] AR 21.

[11] AR 65.

March 18, 2011, to June 13, 2014 (the date of the ALJ decision).[12] The ALJ found that Mr. Absyed was not disabled.[13]

Mr. Absyed requested review of the ALJ's decision by the Appeals Council.[14] The Council denied his request for review.[15] Mr. Absyed sought judicial review[16] and moved for summary judgment.[17] The SSA responded and cross-moved for summary judgment.[18]

## 2.  Summary of Record and Administrative Findings

### 2.1  Medical Records

The court details below Mr. Absyed's major medical treatments over the relevant disability period, including treatments for: (1) abdominal pain; (2) hepatitis C; (3) neck, arm, and wrist pain; (4) hemorrhoids; and (5) mouth, sinus, eye, and skin conditions. The court then describes primary-care physician Dr. Alan Man's treatment notes, which span a substantial part of Mr. Absyed's various treatments, and Dr. Man's opinions that are at issue on appeal.

#### 2.1.1  Mr. Absyed Receives Abdominal-Pain Treatment

On March 18, 2011, Mr. Absyed went to the Santa Clara Valley Medical Center Emergency Department complaining of nausea, vomiting, and abdominal pain.[19] Doctors Avi Patil and David Johnson diagnosed Mr. Absyed with gallstone pancreatitis, for which he received surgery.[20]

Following surgery, Mr. Absyed again visited the emergency department complaining of constant abdominal pain and nausea since surgery.[21] After performing an ultrasound of Mr.

---

[12] AR 21.

[13] AR 21, 31.

[14] AR 16–17.

[15] AR 1–2.

[16] Complaint – ECF No. 1; Motion to Proceed *In Forma Pauperis* – ECF No. 2

[17] Motion for Summary Judgment – ECF No. 23.

[18] Motion for Extension of Time – ECF No. 25; Cross-Motion for Summary Judgment – ECF No. 26.

[19] AR 248.

[20] AR 251, 255.

Absyed's abdomen, PA Susan Bertelsen found no indication of biloma, seroma, or intrahepatic biliary dilation, but she prescribed Vicodin for the pain.[22] She told Mr. Absyed to see his primary-care physician as soon as possible.[23]

In July 2011, Mr. Absyed saw Dr. Rekha Bhaskar, his former primary-care physician, about his abdominal pain post-gallbladder surgery; he described the pain as being 10/10 most of the time.[24] Mr. Absyed reported that Vicodin was not helpful.[25] Dr. Bhaskar noted no weight loss or constipation.[26] Mr. Absyed requested that his disability, which he had been on since May 2011, be extended because the abdominal pain rendered him unable to sit or walk.[27] Dr. Bhaskar extended his disability for another month and advised that Mr. Absyed could return to full-duty work with no restrictions on August 8, 2011.[28]

In August 2011, Mr. Absyed saw Dr. Bhaskar to "follow up on extension of his disability."[29] Mr. Absyed complained about abdominal pain, which he described as a 6/10, and claimed that he was unable to focus on anything but the pain and was therefore depressed.[30] Dr. Bhaskar noted that Mr. Absyed looked very comfortable talking but that he continued to have nausea.[31] Mr. Absyed was not vomiting and he was not experiencing weight loss or a change in appetite.[32] Dr. Bhaskar extended Mr. Absyed's disability for another month while she waited to review his CT-scan results and his hepatitis C treatment records.[33]

---

[21] AR 256.

[22] AR 258–59.

[23] AR 260.

[24] AR 267.

[25] *Id.*

[26] AR 268.

[27] *Id.*

[28] AR 268–70.

[29] AR 283.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] AR 285.

After a brief lapse in insurance coverage, Mr. Absyed returned to see Dr. Bhaskar, who evaluated him for the ongoing abdominal pain, hepatitis C, thrombocytopenia, chronic epistaxis, and mild nodularity cirrhosis.[34] Mr. Absyed previously received two shots for hepatitis B, but he had not started hepatitis C treatment and did not get an advised nasal-mass CT scan.[35] Dr. Bhaskar noted Mr. Absyed was still on disability for the post-surgery abdominal pain and nausea.[36]

In September 2011, Mr. Absyed complained of acid-reflux symptoms, heartburn, a burning sensation in the stomach area, bloating, and vomiting.[37] He also stated that he had intermittent abdominal pain and that he was taking Benadryl as needed to help him sleep at night.[38]

During a follow-up appointment with Dr. Bhaskar in October, Mr. Absyed continued to complain of abdominal pain, intermittent nausea, and diarrhea.[39] He tested positive for H pylori, for which he completed treatment.[40] Dr. Bhaskar noted that while he was still on disability, Mr. Absyed said he would talk to his manager about more restricted work because his security-guard job required a lot of walking, and his abdominal discomfort increased when he is "very active."[41]

In late October 2011, Mr. Absyed sought a second opinion from Dr. Albert Lau for his ongoing, post-surgery abdominal pain.[42] Dr. Lau noted that the abdominal pain, relieved with pain medicine, was "likely multifactorial with recent duodenal ulcer and cirrhosis."[43] Dr. Lau believed that Mr. Absyed's hepatitis C might be contributing to his abdominal pain, but that an abdominal exam "is difficult because of body habitus."[44]

---

[34] AR 294–95.

[35] Id.

[36] AR 294.

[37] AR 308.

[38] Id.

[39] AR 327.

[40] AR 327, 334.

[41] AR 327.

[42] AR 334.

[43] AR 335.

[44] Id.

United States District Court
Northern District of California

In January 2012, Mr. Absyed advised Dr. Bhaskar that he continued to have abdominal pain.[45] Despite an ultrasound showing fatty liver and some changes consistent with cirrhosis, Dr. Bhaskar stated that it could not explain Mr. Absyed's abdominal pain.[46] Mr. Absyed further reported that the H pylori treatment improved his acid reflux, yet he still had some nausea acid regurgitation (mostly at night) for which he was no longer taking medicine.[47] Dr. Bhaskar noted that Mr. Absyed was planning to return to his eight-hour shift in the security control room to see if he could still perform his job without any pain.[48]

### 2.1.2  Mr. Absyed Receives Hepatitis C Treatment

Mr. Absyed began treatment for hepatitis C with Dr. Krisna Chai on May 23, 2012.[49] As reported by R.N. Elizabeth Best, Mr. Absyed needed around 24–28 weeks of therapy.[50]

While receiving hepatitis C treatment in January 2013, Mr. Absyed reported to R.N. Best and Dr. Ready (Dr. Chai was on vacation) that he was bothered by things that did not usually bother him.[51] He said he was depressed, but "able to pull" himself out of it, and did not feel hopeful about the future.[52] Mr. Absyed reported spine problems, decreased appetite and thought processes, restless sleep, and an itching and burning sensation "around his 'body.'"[53] R.N. Best noted that Mr. Absyed did not use lotion on a regular basis, which he said helped the itching and burning.[54]

In March 2013, Mr. Absyed reported being depressed, tearful, and bothered by things that did not usually bother him.[55] He reported insomnia, a decreased appetite, "difficulty keeping his mind

---

[45] AR 416.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] AR 512.

[50] *Id.*

[51] AR 626.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] AR 694.

on what he is doing, feel[ing] like everything he does is an effort," and feeling lonely, sad, and as though people do not like him.[56] R.N. Best noted that Mr. Absyed (who was still under Dr. Chai's care) had a "negative personality and a flat affect."[57] Mr. Absyed reported that his digestive system was "very bad" — he experienced "abdominal pain 1/2 to 1 hour after eating spicy food."[58]

During his April 2013 appointment for hepatitis C, Mr. Absyed asked R.N. Joni Ishikawa if "Dr. Chai would consider permanent disability for him."[59] During this visit, Mr. Absyed reported experiencing flu-like symptoms and "not good" energy levels, but said he had an "okay" appetite and denied experiencing nausea, vomiting, or diarrhea.[60]

In May 2013, Mr. Absyed told pharmacist Jeannette Sanchez that while he did not feel suicidal or want to hurt others, he was fighting with his wife and son daily since he started hepatitis C treatment.[61] He also reported being more irritable and getting angry at "small things."[62] Pharm.D. Sanchez gave Mr. Absyed a psychiatrist's contact information.[63] Blood tests also showed a vitamin D deficiency, for which Dr. Chai prescribed two supplements.[64]

Mr. Absyed finished his hepatitis C treatment in June 2013.[65] He reported that he had no desire and was unable to do things, and that he had a poor appetite.[66] Pharm.D. Sanchez subsequently reported that tests showed his hepatitis C viral load was no longer detectable.[67] Despite continued complaints of chronic liver pain, a scan revealed that Mr. Absyed's liver appeared normal with no

---

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] AR 709.

[60] *Id.*

[61] AR 723.

[62] *Id.*

[63] *Id.*

[64] AR 735.

[65] AR 746.

[66] *Id.*

[67] AR 757.

United States District Court
Northern District of California

significant abnormalities.[68] Dr. Chai said that the liver plain was "unexplained," but that it may be due to nerve irritation.[69] Dr. Chai also explained that while Mr. Absyed's cirrhosis is not reversible, the hepatitis C treatment was "to try to prevent any further damage to the liver."[70] Nevertheless, Dr. Chai stated that cirrhosis does not typically cause liver pain.[71]

### 2.1.3  Mr. Absyed Receives Treatment for Neck, Arm, & Wrist Pain

In March 2012, Mr. Absyed saw Dr. Pradipta Ghosh about pain in his right wrist.[72] Mr. Absyed claimed that Vicodin did not provide any pain relief and the pain prevented him from sleeping.[73] Dr. Ghosh diagnosed the wrist pain as "tendonitis, dequervains" (or, dequervains tenosynovitis) and recommended "rest, immobility with a wrist brace, [and] capsaicin cream."[74] Dr. Ghosh reviewed with Mr. Absyed the risks of a tendon steroid injection.[75] Mr. Absyed had the steroid injection the following week, but 10 days later reported to Dr. Man (his primary-care physician at the time, see Section 2.1.5 below) that he was still experiencing wrist pain.[76]

Mr. Absyed also saw Dr. Howard Lin about his right wrist pain.[77] Dr. Lin confirmed Dr. Ghosh's dequervains tenosynovitis diagnosis, recommended ice, and referred Mr. Absyed to hand therapy for splinting and a rehabilitation program.[78] Mr. Absyed declined reinjection at the time because he was "scheduled to see [Dr. Chai] [the] next week for chronic hep[atitis] C."[79]

---

[68] AR 771–72.

[69] AR 788.

[70] *Id.*

[71] *Id.*

[72] AR 436.

[73] *Id.*

[74] AR 438.

[75] *Id.*

[76] AR 445, 462.

[77] AR 485.

[78] AR 486.

[79] *Id.*

United States District Court
Northern District of California

In January 2013, Mr. Absyed visited Dr. John Pan for his right extremity and back pain.[80] Mr. Absyed felt unable to use his right upper extremity to lift things and had some non-severe low back pain.[81] He reported numbness and weakness.[82] Standing, lying, walking, and lifting made his pain worse, but sitting made it better.[83] Although he previously took Ibuprofen and Tylenol for the pain, he was instructed to stop due to his hepatitis C treatment.[84]

Dr. Pan's examination showed that Mr. Absyed's upper right extremity was diffusely weaker (4/5), including decreased strength in his shoulder abduction (4/5) and elbow flexion and extension (4/5), and that there was diffusely diminished light touch throughout the right side of Mr. Absyed's body.[85] Dr. Pan noted 5/5 strength in wrist extension, finger flexion, and hand intrinsics.[86] An MRI showed "severe spinal canal stenosis worst at C4-5[,] C5-6[,] [and] C6-7."[87] Dr. Pan attributed Mr. Absyed's symptoms to the spinal canal stenosis and "cervical radiculopathy, multilevel on the right."[88] But, given Mr. Absyed's history of medical issues, the mild level of pain, and the lack of significant radicular pain, Dr. Pan recommended continuation of conservative care and referred him for physical therapy.[89] Mr. Absyed later reported to Dr. Man that physical therapy was not helpful with his right hand pain.[90]

In April 2013, on referral from Dr. Pan, Mr. Absyed met with Dr. Steven Spisak about his right hand, neck, and back pain.[91] Mr. Absyed reported that since his visit with Dr. Pan, he noticed

---

[80] AR 632–33.

[81] AR 633.

[82] Id.

[83] Id.

[84] Id.

[85] AR 636.

[86] Id.

[87] Id.

[88] Id.

[89] Id.

[90] AR 676.

[91] AR 809–10.

clumsiness in his hands and decreased coordination in his upper and lower extremities.[92] His symptoms were worse with prolonged walking and standing and improved with sitting, although all activities were affected to some degree.[93] Mr. Absyed denied any walking limitations.[94]

During Mr. Absyed's physical examination, Dr. Spisak noted that although there was no strong evidence of cervical myelopathy, Mr. Absyed's fine motor coordination in his hands was slightly slowed and uncoordinated.[95] He observed that Mr. Absyed was able to transition from a seated position to standing "without any obvious difficulty," but walked with an occasional broad-based gait with some very mild ataxia intermittently.[96] Dr. Spisak noticed occasional loss of balance.[97] Mr. Absyed was able to walk "on heels and toes with a broad stance."[98]

Dr. Spisak diagnosed Mr. Absyed with cervical degenerative disc disease and cervical spinal stenosis, "most severe" at the C3-4 and 4-5 intervals and "extending all the way down to the cervicothoracic junction."[99] He suggested decompression as a treatment option, but recommended that Mr. Absyed complete his hepatitis C treatment before turning to surgery because he was at a much higher risk for epidural hematoma.[100]

### 2.1.4  Mr. Absyed Receives Mouth, Sinus, Eye, Hemorrhoids, & Skin Treatment

Over the course of the relevant period, Mr. Absyed received treatment for eye pain, mouth lesions, hemorrhoids, and sinus problems.

First, in 2011, Mr. Absyed had surgery on his lip and sinus. In July, Dr. Bhaskar referred Mr. Absyed for maxillary surgery to remove a "firm musocal lesion" in his upper right lip that bled

---

[92] AR 809.

[93] AR 810.

[94] Id.

[95] AR 811.

[96] AR 810.

[97] Id.

[98] Id.

[99] AR 811.

[100] Id.

when irritated.[101] Dr. Nikhil Desai performed the procedure and removed the lesion.[102] Then, in September, Mr. Absyed visited Dr. Sachin Parikh for sinus problems and a nasal obstruction.[103] A CT-scan of Mr. Absyed's sinus revealed right maxillary sinusitis, and Dr. Parikh recommended sinus surgery.[104] Mr. Absyed asked for a second opinion from Dr. Ali Rezaee, who confirmed Dr. Parikh's diagnosis and recommendation.[105] Dr. Michael Friduss performed Mr. Absyed's functional endoscopic sinus surgery in December and successfully flushed out the right maxillary sinus.[106] In January 2012, Mr. Absyed told Dr. Bhaskar that his sinus problems were better.[107]

Second, Mr. Absyed received treatment for eye pain in 2011 and 2012. Mr. Absyed saw Dr. David Scott in August 2011 for constant eye pain, for which he took pain medication every day and Vicodin "when [the] pain is intolerable."[108] Dr. Scott noted that Mr. Absyed's "only interest" that day was to get a Vicodin prescription.[109] An eye exam revealed no physical findings confirming his eye pain.[110] Dr. Scott prescribed pain medicine and recommended artificial tears and cold compresses.[111] In April 2012, Mr. Absyed again complained of eye irritation, especially when reading.[112] Dr. Eva Kim diagnosed Mr. Absyed with mild dry eyes, for which she recommended omega-3 supplements, and nightly warm compresses and lid scrubs.[113]

Third, Mr. Absyed met with Dr. Chai in March 2012 on a referral from Dr. Man (Mr. Absyed's primary-care physician, see Section 2.1.5) for "intermittent rectal bleed[] attributed to

---

[101] AR 268–69.

[102] AR 268–69, 274.

[103] AR 302.

[104] AR 303.

[105] AR 314.

[106] AR 361.

[107] AR 416.

[108] AR 287.

[109] *Id.*

[110] AR 289.

[111] *Id.*

[112] AR 480.

[113] AR 483.

United States District Court
Northern District of California

hemorrhoids."[114] Dr. Chai performed a colonoscopy, removed polyps, and noted sigmoid diverticulosis and "[m]oderate internal hemorrhoids."[115] Dr. Chai recommended a high-fiber diet and a follow-up with pathology.[116]

Fourth, Mr. Absyed met with Dr. Eileen Yadav in January 2013 for skin lesions.[117] During this visit, Dr. Yadav performed a biopsy of a growth on Mr. Absyed's left leg.[118] The biopsy indicated a benign verrucous keratosis and no evidence of malignancy.[119]

### 2.1.5  Dr. Man treats Mr. Absyed and Writes Two Opinions

In March 2012, Mr. Absyed started seeing Dr. Alan Man as his primary-care physician. Dr. Man treated Mr. Absyed for many of the conditions above, often referring him to the doctors previously mentioned, and filled out two questionnaires that are at issue on appeal.

In March 2012, before he started his hepatitis C treatment, Mr. Absyed saw Dr. Man for his ongoing abdominal pain, right wrist pain, and chronic internal hemorrhoids.[120] Dr. Man reported that Mr. Absyed felt his chronic abdominal pain and illness affected his concentration so that he was unable to do his job as a security guard.[121]

Mr. Absyed continued to complain about the wrist pain and arm weakness in January 2013, stating that he had trouble opening the car door.[122] During this visit, Mr. Absyed also complained of fatigue and depression resulting from his hepatitis C treatment.[123] Dr. Man noted that Mr.

---

[114] AR 448–49.

[115] AR 449, 451.

[116] *Id.*

[117] AR 612–13.

[118] *Id.*

[119] AR 614.

[120] AR 430.

[121] *Id.*

[122] AR 599–600.

[123] AR 600.

Absyed did not want to take anything else for the depression and further thought Mr. Absyed would need to see a dermatologist for a skin lesion.[124]

During a follow-up appointment after completing his hepatitis C treatment, Mr. Absyed said he felt "a little better," but was still fatigued after hepatitis C treatment and continued to experience chronic abdominal pain.[125] He felt that he could do only 10–15 minutes of moderate activity before having to rest.[126] Dr. Man noted that Mr. Absyed did not have progressive symptoms and did not complain about the weakness or numbness in his right hand that he reported previously.[127] He stated that there was no "clear activity limitation."[128] Mr. Absyed requested an extension of his disability because of his fatigue and abdominal pain, and Dr. Man granted an additional 3 months.[129] Mr. Absyed expressed his desire for permanent disability.[130] And, "[d]ue to his continuing fatigue after hep[atitis] C treatment, [and] chronic abdominal wall pain," Dr. Man believed Mr. Absyed was "disable[d] for the time being, perhaps long term."[131]

During a follow-up appointment three months later, Mr. Absyed felt he was still disabled due to: (1) constant right upper quadrant pain; (2) decreased appetite; (3) persisting cough; (4) upper back pain; (5) increasing memory loss; (6) difficulty sleeping; (7) body aches; (8) increased difficulty getting out of a chair; (9) right arm weakness; and (10) erectile dysfunction.[132] Dr. Man noted that Mr. Absyed had gained weight despite his claimed decrease in appetite.[133] Dr. Man prescribed Zolpidem (a sleep aid) and noted that Mr. Absyed declined surgery "for now" for his

United States District Court
Northern District of California

---

[124] AR 600–01.

[125] AR 775.

[126] Id.

[127] AR 777.

[128] Id.

[129] AR 775, 777.

[130] Id.

[131] AR 777.

[132] AR 793.

[133] Id.

spinal stenosis.[134] Dr. Man extended Mr. Absyed's work disability for another two months, until January 2014.[135]

Dr. Man completed two questionnaires, in January 2014 and in May 2014, supporting Mr. Absyed's claim for disability.[136] In Dr. Man's January 2014 opinion, he stated that Mr. Absyed's medical problems, which include (1) severe depression; (2) cirrhosis of the liver; and (3) spinal stenosis, preclude him from performing any full-time work at any exertion level, including the sedentary level.[137] He opined that at one time, without rest or support, Mr. Absyed could sit indefinitely, but only stand and/or walk for 5–10 minutes.[138] However, over an 8-hour period (*i.e.* a work day), Mr. Absyed could sit for 4 hours and stand and/or walk for 2 hours.[139] Dr. Man indicated that Mr. Absyed did not need to lie down or elevate his legs, and he did not identify any additional work limitations.[140] He stated that Mr. Absyed had been disabled since March 2011.[141]

In Dr. Man's May 2014 opinion, he stated that Mr. Absyed's medical problems, which include (1) depression; (2) hand pain; and (3) abdominal pain, preclude him from performing any full-time work at any exertion level, including the sedentary level.[142] Mr. Absyed could sit, stand, and walk for "several hours" without support.[143] Dr. Man indicated that Mr. Absyed does not need to lie down or elevate his legs, but noted an additional hand-related work limitation.[144] He stated that Mr. Absyed had been disabled since June 2013.[145]

---

[134] AR 796.

[135] *Id.*

[136] AR 830, 939.

[137] AR 830.

[138] *Id.*

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] AR 939.

[143] *Id.*

[144] *Id.*

[145] *Id.*

### 2.1.6  Agency Physicians G. Williams and Sadda Reddy

In August 2012, G. Williams M.D. reviewed and summarized Mr. Absyed's medical records.[146]  He determined that Mr. Absyed's conditions results in some limitations but did not prevent his prior work as a security officer.[147] On reconsidering the denial of Mr. Absyed's request for benefits, Dr. Sadda Reddy reviewed and summarized Mr. Absyed's medical records[148] and affirmed Dr. Williams's opinion, noting that, "[c]onsidering fatigue due to hepatitis C and related treatment," Mr. Absyed's "prior RFC determination of light is appropriate."[149]

### 2.2  Mr. Absyed's Testimony

Mr. Absyed testified before the ALJ on May 22, 2014.[150] The ALJ asked Mr. Absyed about his work history.[151] In 2003, Mr. Absyed worked at a 99 Cents store as an assistant manager, which included opening and closing the store, stocking shelves, working the cash register, and various bookkeeping tasks.[152] Except for that year, Mr. Absyed's other work was as a security officer.[153]

Mr. Absyed's attorney, Jeffrey Milam, then questioned his client.[154] Mr. Milam asked Mr. Absyed whether his position at the 99 Cents store in 2003 was a full-time job.[155] Mr. Absyed responded that it was a full-time job, where he worked ten-hour days.[156] When asked the duration of this job, Mr. Absyed answered that he was employed at the 99 Cents store for "20 months," or from December 2001 to 2003.[157]

---

[146] AR 85–95.

[147] AR 95.

[148] AR 110–32.

[149] AR 113, 114, 118, 125, 126, 130.

[150] AR 63, 68.

[151] AR 68.

[152] AR 69.

[153] AR 70.

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Id.*

Mr. Milam then asked about Mr. Absyed's education.[158] Mr. Absyed stated that he received a Bachelor of Commerce degree in Pakistan.[159] When asked about his reading and writing proficiency in English, Mr. Absyed said that he was having difficulty comprehending the language after experiencing liver and memory issues.[160] When the ALJ asked Mr. Absyed whether he could understand the text of an English newspaper, he said he could, but that sometimes he had to focus more to understand the meaning of the paragraph.[161]

Mr. Milam asked Mr. Absyed if he still held a security-guard license and its expiration date.[162] Mr. Absyed answered that his security-guard license was active until February 2015.[163] When asked whether he carried a weapon, Mr. Absyed said that he did not.[164] Mr. Milam inquired whether Mr. Absyed believed he could go back to his security-guard job.[165] Mr. Absyed said he could not because of his spinal issue, which kept him from sitting, lying down, or walking for extended periods of time.[166] Mr. Milam asked how long Mr. Absyed could sit at one time, and Mr. Absyed replied that he could sit for less than 30 minutes before his heart beat would increase rapidly and he needed to walk around.[167] He said that while shifting around in his chair was not helpful, walking around for five to ten minutes before sitting down again was.[168] Mr. Absyed added that he could be on his feet for only 30 minutes before having to sit down again.[169]

---

[158] AR 71.

[159] *Id.*

[160] *Id.*

[161] AR 71–72.

[162] AR 72.

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] AR 73.

[169] *Id.*

1        Mr. Milam then asked Mr. Absyed how many pounds he could lift, to which Mr. Absyed

2    replied that he could lift only 5 pounds because of his right-hand pain.[170] Mr. Absyed also testified

3    that he had constant pain in his neck and back.[171] Although he was offered the option of surgery,

4    he stated that he could not take the risk because of his liver issues.[172]

5        Mr. Milam then questioned Mr. Absyed about any problems related to his hepatitis or

6    cirrhosis.[173] While Mr. Absyed answered that his blood and liver are checked every six months

7    because these issues cannot be cured, Mr. Milam clarified whether Mr. Absyed's back problem

8    would keep him from working.[174] Mr. Absyed responded that he experienced ongoing liver and

9    gallbladder pain that precluded him from working.[175]

10       Mr. Milam asked Mr. Absyed whether he had any issues with fatigue.[176] Mr. Absyed

11   responded that he did experience fatigue and woke up tired.[177] When asked whether he was still

12   having problems with nausea and the frequency of the nausea, Mr. Absyed testified that he had

13   nausea 30 minutes after eating, which prevented him from cleaning up afterwards.[178] Mr. Milam

14   then asked how often Mr. Absyed experienced nausea, and Mr. Absyed said he did not know the

15   reason for the nausea, but that it was due to pain and his stomach being unable to empty food.[179]

16   Mr. Milam again clarified his question, asking how often Mr. Absyed experienced problems with

17   nausea and vomiting.[180] Mr. Absyed replied, "when I had surgery of my gallbladder."[181] Mr.

18   Milam then asked whether he had nausea or vomiting on the day of the hearing, to which Mr.

_____

[170] Id.

[171] AR 74.

[172] Id.

[173] Id.

[174] AR 75.

[175] Id.

[176] Id.

[177] Id.

[178] Id.

[179] Id.

[180] Id.

[181] AR 76.

United States District Court
Northern District of California

Absyed replied that he did.[182] When asked whether he experienced nausea the day before and whether he had it almost every day, Mr. Absyed stated that he had it the day before and that he thought he had it almost every day.[183]

Mr. Milam asked what Mr. Absyed does to help reduce his problems with nausea and vomiting.[184] Mr. Absyed replied that the doctor does not allow him to take too many medications due to side effects.[185] When asked whether that means that he must "live with it," Mr. Absyed said that he cannot eat too much and that he does not know.[186]

Mr. Milam further asked Mr. Absyed about any changes in his activities.[187] He first asked Mr. Absyed whether he ever has to lie down, to which Mr. Absyed replied that he had to lie down and sleep for 15 to 20 minutes.[188] He also explained that his activities subsequently changed.[189] When Mr. Milam asked what changed, Mr. Absyed stated that he was very healthy before and now he was very weak.[190] Mr. Milam then asked what kind of things Mr. Absyed stopped doing.[191] Mr. Absyed responded that he had stomach, liver, and spinal pain, for which his doctor prescribed pain and sleeping medication.[192] Mr. Milam again clarified that he asked Mr. Absyed about how his activities had changed, asking whether he could do everything he used to do before or whether he had to cut back on those activities.[193] Mr. Absyed stated that after eating breakfast, he usually took his medication and rested for 15–20 minutes.[194] Again stating his original question, Mr. Milam

---

[182] Id.

[183] Id.

[184] Id.

[185] Id.

[186] Id.

[187] Id.

[188] Id.

[189] Id.

[190] AR 76–77.

[191] AR 77.

[192] Id.

[193] Id.

[194] Id.

United States District Court
Northern District of California

asked what kind of things Mr. Absyed stopped doing, to which he responded that he could no longer take care of his apartment, feed himself, or attend religious activities.[195] He added that his wife helped "a little bit" with these tasks.[196] When asked whether he attends a religious institution, Mr. Absyed testified that although he did in the past, he had to stop attending religious activities because his health did not allow him to do so.[197]

Mr. Milam questioned Mr. Absyed about the length of his hepatitis treatment with Interferon.[198] Mr. Absyed testified that he received the treatment for almost six months.[199] Mr. Milam further asked whether the doctors had discussed giving Mr. Absyed further treatment with Interferon.[200] Mr. Absyed stated "[i]t depends on the doctors and if [his] liver doctor got the same thing," then they would give him further treatment and he would also need surgery.[201]

Mr. Absyed testified that he uses heat for his pain.[202] Mr. Milam then questioned Mr. Absyed about whether he used any kind of braces for his back or neck.[203] Mr. Absyed replied: "No. Sometimes but not every time."[204] When asked about doing any kind of stretching or exercising, Mr. Absyed testified that he could not do so because whenever he did light exercises, he felt pain in his stomach that caused him to vomit.[205]

Mr. Milam asked Mr. Absyed if he ever noticed swelling in his stomach area, clarifying whether he noticed the swelling after his gallbladder surgery.[206] Mr. Absyed stated that after the

---

[195] AR 77–78.

[196] AR 77.

[197] AR 77–78.

[198] AR 78.

[199] *Id.*

[200] *Id.*

[201] *Id.*

[202] *Id.*

[203] *Id.*

[204] *Id.*

[205] AR 79.

[206] *Id.*

surgery he did have that problem.[207] The ALJ asked whether he gets swollen, and Mr. Absyed replied "huh," and then Mr. Milam proceeded with his next question.[208] Mr. Milam asked whether Mr. Absyed's doctors were doing anything about the stomach swelling, but Mr. Absyed testified that his doctor told him that he had to "live with this kind of problem" and that they could not do anything about it.[209]

        After Mr. Milam concluded his questioning of Mr. Absyed, the ALJ asked what Mr. Absyed could do physically.[210] Referring to Mr. Absyed's earlier testimony that he could only be on his feet for 30 minutes, the ALJ asked whether that meant standing, walking, or both.[211] Mr. Absyed stated that he could not stand for 30 minutes.[212] When asked about walking and the distance he could walk, Mr. Absyed replied that due to his condition, he had to walk very slowly.[213] The ALJ then asked Mr. Absyed whether he could walk one mile.[214] Mr. Absyed said that he could, but not after the surgery.[215] The ALJ asked whether on the day of Mr. Absyed's testimony he could walk for one mile, to which Mr. Absyed responded that he could not.[216] When questioned how far he could walk, Mr. Absyed stated that he could walk two or three blocks in 45 minutes.[217] Mr. Absyed testified that he drove a car short distances to buy groceries.[218] Lastly, the ALJ asked whether Mr. Absyed was right- or left-handed, to which he responded that he is right-handed.[219]

---

[207] *Id.*

[208] *Id.*

[209] *Id.*

[210] *Id.*

[211] AR 79–80.

[212] AR 80.

[213] *Id.*

[214] *Id.*

[215] *Id.*

[216] *Id.*

[217] *Id.*

[218] *Id.*

[219] AR 81.

United States District Court
Northern District of California

### 2.3  Vocational-Expert Testimony

Vocational Expert Linda Ferra testified at the hearing on May 22, 2014.[220] The ALJ first asked Ms. Ferra to give a summary of Mr. Absyed's work history.[221] Ms. Ferra stated that Mr. Absyed has worked primarily as a security guard, a semiskilled position that is light in exertion.[222] For Mr. Absyed's work as an assistant manager, Ms. Ferra explained that there is no code for "assistant manager" in the Dictionary of Occupational Titles (DOT).[223] Therefore, unless a person is a manager, the position is classified as a cashier checker (cashier II), even though he may have been a lead worker.[224] Ms. Ferra further stated that Mr. Absyed's position as a cashier checker is considered a semiskilled job with light exertion.[225]

The ALJ asked whether the skills acquired through Mr. Absyed's security guard and cashier positions would transfer to other light or sedentary work.[226] Ms. Ferra replied that it would not.[227]

The ALJ posed a hypothetical question about whether an individual of Mr. Absyed's age, education level, and work experience could perform any of his past relevant work if that person had the following limitations: (1) capable of light exertional activity, including the ability to occasionally climb ramps and stairs and the ability to occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, and scaffolds; (2) "frequent handle and finger" of the right dominant upper extremity with no forceful gripping or other manipulative limits; and (3) no exposure to any hazards, such as unprotected heights and

---

[220] AR 63.

[221] AR 81.

[222] *Id.*

[223] *Id.*

[224] *Id.*

[225] AR 82.

[226] *Id.*

[227] *Id.*

United States District Court
Northern District of California

dangerous machinery.[228] Ms. Ferra testified that such a person could perform Mr. Absyed's past work.[229]

The ALJ asked Ms. Ferra how many absences per month employers customarily tolerate.[230] Ms. Ferra testified that employers customarily tolerate anywhere between 6 and 12 absences per year.[231] She further explained that this figure assumes that an employee may be absent for 3 or 4 days in one month with the flu, at which time and employer will anticipate that the employee will not be absent again for a long time.[232] The ALJ further asked how much time employers would customarily tolerate for time off task for any reason.[233] Ms. Ferra responded that employers would tolerate no more than 10% time off task in excess of regularly scheduled breaks.[234]

### 2.4  Administrative Findings

The ALJ held that Mr. Absyed was not disabled within the meaning of the Social Security Act from March 18, 2011, through June 13, 2014 (the date of the ALJ decision).[235]

The ALJ identified the SSA's five-step evaluation process to determine whether an individual is disabled.[236] At step one, the ALJ must determine whether the individual is engaging in "substantial gainful activity."[237] At step two, the ALJ must determine whether the individual had a medically determinable impairment that is "severe" or a combination of impairments that is "severe."[238] At step three, the ALJ must determine whether the individual's impairments are

---

[228] AR 82–83.

[229] AR 83.

[230] *Id.*

[231] *Id.*

[232] *Id.*

[233] *Id.*

[234] *Id.*

[235] AR 21.

[236] AR 22.

[237] *Id.*

[238] *Id.*

United States District Court
Northern District of California

severe enough to meet a listed impairment.[239] At step four, the ALJ must first determine the individual's "residual functional capacity" and then determine whether the individual could perform the requirements of his "past relevant work."[240] At step five, the ALJ must determine whether the individual can perform any other work, taking into account the individual's residual functional capacity, age, education, and work experience.[241]

At step one, the ALJ found that Mr. Absyed did not engage in substantial gainful activity since March 18, 2011, the alleged onset date.[242]

At step two, the ALJ found that Mr. Absyed had the following severe impairments: "multi-level DDD (including advanced canal stenosis C3-T1); cirrhosis; hepatitis C; and a history of thrombocytopenia (with no history of transfusions)."[243] The ALJ found that these impairments significantly limited Mr. Absyed's work-related activity.[244] Mr. Absyed also reported several non-severe impairments that the ALJ stated did not result in a significant limitation in work related activity, including: diabetes, pancreatitis and abdominal pain, eye impairments, obesity, sinus impairment, hand impairment, hypertension, and depression.[245]

At step three, the ALJ found that Mr. Absyed did not have an impairment or combination of impairments that met or medically equaled a listed impairment.[246] In making this determination, the ALJ reviewed Mr. Absyed's impairments under the abdominal, musculoskeletal, and hematology listings and determined that Mr. Absyed's impairments did not meet or equal a

---

[239] Id.

[240] AR 22–23.

[241] AR 23.

[242] Id.

[243] Id.

[244] Id.

[245] AR 24–25.

[246] AR 26.

United States District Court
Northern District of California

1   listing.[247] Among other things, the ALJ stated that Mr. Absyed did not provide evidence of ascites

2   or an inability to ambulate effectively.[248]

3      Before considering the fourth step, the ALJ determined that Mr. Absyed had the residual

4   functional capacity ("RFC") to perform light work.[249] The ALJ determined that this work was

5   limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps

6   and stairs.[250] Also, the work was limited to frequent handling and fingering, with no forceful

7   gripping with the right dominant upper extremity.[251] The ALJ determined that Mr. Absyed was not

8   to climb ladders, ropes, and scaffolds.[252] Lastly, the ALJ found that Mr. Absyed must avoid all

9   exposure to work related hazards, including unprotected heights and dangerous machinery.[253]

10     To make this RFC determination, the ALJ followed a two-step process in which he (1)

11  determined whether there were underlying medically determinable physical or mental impairments

12  that could reasonably be expected to produce Mr. Absyed's pain or other symptoms, and (2)

13  determined the extent to which the impairments limited Mr. Absyed's functioning.[254] The ALJ

14  considered Mr. Absyed's testimony regarding his ability to work, pain level, injuries, pain

15  treatment, and abilities.[255] After considering the evidence, the ALJ determined that Mr. Absyed's

16  medically determinable impairment could reasonably be expected to cause the alleged symptoms,

17  but the ALJ did not accept Mr. Absyed's statements about the intensity, persistence, and limiting

18  effects of these symptoms.[256] The ALJ considered multiple credibility factors, including: (1) Mr.

19  Absyed's intermittent complaints; (2) the lack of corroborative clinical findings; (3) the absence of

20

21  _____

    [247] *Id.*

22  [248] *Id.*

23  [249] *Id.*

24  [250] *Id.*

    [251] *Id.*

25  [252] *Id.*

26  [253] *Id.*

27  [254] *Id.*

    [255] *Id.*

28  [256] AR 28.

corroborative diagnostic findings; (4) Mr. Absyed's disability-seeking behaviors; and (5) his receipt of routine and conservative treatment.[257]

Although Mr. Absyed testified about short-term memory loss while receiving hepatitis C treatment, the ALJ determined that there was no evidence that the memory loss, if any, was severe.[258] The ALJ cited to the fact that Mr. Absyed's doctors did not refer him for neuropsychological testing or recommend any precautions, such as not driving.[259] The doctors consistently noted normal mental-status findings for Mr. Absyed, who consistently declined mental-health treatment or referrals.[260] The ALJ therefore determined that Mr. Absyed's claim of severe memory loss was not credible.[261]

Mr. Absyed testified that he could not work due to his inability to stand or walk for longer than 30 minutes.[262] But the ALJ determined that Mr. Absyed did not present evidence that he could not perform the standing associated with light work.[263] The ALJ noted that this testimony was not corroborated by the record because Mr. Absyed never reported trouble with standing or walking.[264] The only difficulty he reported was some right arm numbness and weakness that was worse when standing.[265] Relying on medical evidence that showed "normal motor strength in the lower extremities" and X-rays that did not reveal any "obvious instability," the ALJ found that Mr. Absyed's testimony about his inability to stand for extended periods of time was not supported by the evidence.[266]

---

[257] AR 28–29.

[258] AR 29.

[259] *Id.*

[260] *Id.*

[261] *Id.*

[262] *Id.*

[263] *Id.*

[264] *Id.*

[265] *Id.*

[266] *Id.*

United States District Court
Northern District of California

Mr. Absyed also testified that he can sit for a maximum of 30 minutes.[267] But the ALJ again determined that Mr. Absyed did not present evidence that he could not do the sitting associated with light work.[268] The ALJ relied on the fact that Mr. Absyed never reported trouble sitting to his doctors, instead reporting that his musculoskeletal pain was better when sitting.[269] The medical evidence was not consistent with an individual with trouble sitting because it was consistently noted that Mr. Absyed appeared "comfortable and in no acute distress."[270] The ALJ also noted that Mr. Absyed did not exhibit any obvious problems sitting during the hearing.[271]

The ALJ further determined that Mr. Absyed's testimony about only being able to lift 5 pounds was not supported by the record.[272] The ALJ noted that although Mr. Absyed complained about intermittent right arm pain and weakness, he denied experiencing these symptoms in July 2013.[273] According to the ALJ, the medical evidence revealed that, at most, some doctors noted a slight reduction in motor strength of the upper extremities, while others noted normal strength.[274] The ALJ pointed out that Mr. Absyed only received routine and conservative treatment with medication and short-term physical therapy.[275] And the ALJ considered a doctor's note that, as of November 2013, Mr. Absyed did not show any progression of symptoms.[276]

The ALJ considered Mr. Absyed's testimony that he had liver and gallbladder pain that did not allow him to work.[277] The ALJ noted that the record showed that Mr. Absyed intermittently complained about abdominal pain, but that the doctors were unsure of the origin.[278] The ALJ also

---

[267] *Id.*

[268] *Id.*

[269] *Id.*

[270] *Id.*

[271] *Id.*

[272] *Id.*

[273] *Id.*

[274] *Id.*

[275] *Id.*

[276] *Id.*

[277] *Id.*

[278] *Id.*

United States District Court
Northern District of California

1    noted that, after Mr. Absyed successfully received hepatitis C treatment, he continued to complain

2    about abdominal tenderness, but for which there was no evidence suggesting that he could not

3    work.[279] In fact, the ALJ pointed out, Mr. Absyed reported that he was "doing fine" in March

4    2013, and his doctor stated that he could return to work, despite his symptoms.[280] Mr. Absyed also

5    reported that he was told by his doctors to "learn to live with his chronic abdominal wall pain," but

6    the ALJ noted that he could not find any evidence that such a statement was ever made to Mr.

7    Absyed.[281] The ALJ reported that the only recommendation, according to the medical evidence,

8    was for Mr. Absyed to get tested for H Pylori because Mr. Absyed reported that his pain

9    symptoms previously improved when he underwent treatment.[282]

10       The ALJ also considered Mr. Absyed's testimony that his ongoing fatigue required him to

11   frequently lie down throughout the day.[283] The ALJ determined that the evidence did not support

12   that Mr. Absyed suffered from fatigue that would preclude light work with appropriate

13   restrictions.[284] The ALJ noted that while Mr. Absyed reported some fatigue during his hepatitis C

14   treatment, it appeared to be a temporary side effect, as the medical evidence did not indicate any

15   findings consistent with an individual suffering from debilitating fatigue and Mr. Absyed was

16   consistently noted as appearing "well," "in no acute distress," and with "normal motor

17   strength."[285] Further, the ALJ discussed, Dr. Man opined that Mr. Absyed did not need to lie down

18   or elevate his legs, and another doctor recommended regular exercise.[286]

19       The ALJ determined that Mr. Absyed's testimony about suffering from nausea and vomiting

20   "almost every day" was not supported by the record.[287]

21

22   [279] AR 29–30.

23   [280] AR 30.

24   [281] *Id.*

     [282] *Id.*

25   [283] *Id.*

26   [284] *Id.*

27   [285] *Id.*

     [286] *Id.*

28   [287] *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1        The ALJ gave limited weight to the opinions of Dr. Man because his medical source

2    statements in January 2014 and May 2014 appeared "vague and inconsistent with each other."[288]

3    The ALJ stated that in his January 2014 statement, Dr. Man opined that Mr. Absyed could sit

4    indefinitely and stand and walk for a maximum of 5 minutes at one time.[289] But, Dr. Man further

5    opined that Mr. Absyed could only sit for 4 hours and stand and walk for a maximum of 2 hours

6    during an 8-hour workday.[290] The ALJ further wrote that in his May 2014 statement, Dr. Man

7    opined that Mr. Absyed "could perform all sit, standing, and walking for 'several hours.'"[291] The

8    ALJ stated that due to the vagueness and inconsistencies between the two statements, if he were

9    going to give significant weight to the statements, he would give it to the May 2014 opinion

10    because it reflected Mr. Absyed's functioning after his hepatitis C became undetectable.[292]

11        The ALJ gave significant weight to the DDS medical consultants' opinion that Mr. Absyed

12    could perform light work with some restrictions.[293] The ALJ determined that this opinion was

13    consistent with Mr. Absyed's "intermittent complaints, clinical and diagnostic findings, and the

14    successful hepatitis C Interferon treatment."[294]

15        At step four, the ALJ determined that Mr. Absyed was capable of performing his past relevant

16    work as a security guard and "cashier/checker" because this work did not require the performance

17    of work-related activities precluded by Mr. Absyed's RFC.[295] The ALJ noted that his past relevant

18    work was completed within the last 15 years, long enough to have learned the jobs.[296] The ALJ

19    compared Mr. Absyed's RFC with the physical and mental demands of this work and found that

20

21

---

22    [288] *Id.*

23    [289] *Id.*

24    [290] *Id.*

25    [291] *Id.*

26    [292] *Id.*

27    [293] *Id.*

28    [294] *Id.*
     [295] *Id.*
     [296] *Id.*

he would be able to perform it "as actually and generally performed."[297] The ALJ further relied on the VE's testimony that "an individual with the [Mr. Absyed's] age, education, work profile, and assessed limitations could perform this work as generally and actually performed."[298]

The ALJ therefore determined that Mr. Absyed was not disabled from March 18, 2011, through the date of the ALJ decision.[299]

**ANALYSIS**

**1. Standard of Review**

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates the suit within 60 days of the decision. District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotations omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.* at 1039–40; *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

**2. Applicable Law**

An SSI claimant is considered disabled if he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and the "impairment

---

[297] AR 31.

[298] *Id.*

[299] *Id.*

United States District Court
Northern District of California

or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A), (B).

There is a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's residual functional capacity ("RFC"), is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. *See* 20 C.F.R. § 404.1520(a)(4)(v).

For steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F.3d at 1098. At step five, the burden shifts to the Commissioner to show that the claimant can do other kinds of work. *Id.*

### 3.  Application

Mr. Absyed argues that the ALJ twice erred in his disability determination.[300] First, he argues, the ALJ erred in his RFC determination because he improperly gave limited weight to the opinion of treating physician Dr. Man.[301] Second, Mr. Absyed asserts, the ALJ erred when he discredited Mr. Absyed's testimony.[302]

### 3.1  The ALJ Erred in Assigning Limited Weight to Treating Physician Dr. Man's Opinions

The first issue is whether there is substantial evidence supporting the ALJ's decision to give limited weight to the opinion of treating, primary-care physician Dr. Man.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). An ALJ may not, however, interject or substitute her own medical opinion or diagnosis for that of the claimant's physician. *See Tackett*, 180 F.3d at 1102–03; *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden from making his own medical assessment beyond that demonstrated by the record); *see also Ladue v. Chater*, No. C-95-0754 EFL, 1996 WL 83880, at *3 (N.D. Cal. Feb. 16, 1996) (stating that "[d]isability hearings are not adversarial in nature" and "the ALJ has duty to develop the record" and "inform himself about [the] facts," even if "the claimant is represented by counsel").

In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must [also] consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotations omitted)).

---

[300] *See* Motion for Summary Judgment at 15–27.

[301] *See id.* at 15–21.

[302] *See id.* at 21–25.

Social Security regulations distinguish between three types of physicians: treating physicians; examining physicians; and non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *see also Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir. 1987) (the opinion of a treating physician is generally given the greatest weight because the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual"); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (alteration in original) (internal quotations omitted). If the ALJ finds that the opinion of a treating physician is contradicted, the ALJ must provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotations omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotations omitted)). "Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Id.*; *see also* 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, we will give it controlling weight.").

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social

United States District Court
Northern District of California

Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id*. (quoting 20 C.F.R. § 404.1527(b)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id*. (citing 20 C.F.R. § 404.1527(d)(3)–(6)). Even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996), 61 Fed. Reg. 34,490, 34,491 (July 2, 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* (quoting SSR 96-02p at 4).

Finally, an "ALJ errs when he rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13.

Here, the ALJ gave "limited weight" to treating physician Dr. Man's opinions when determining that Mr. Absyed had the RFC to perform "light work," with certain limitations.[303]

In his January 2014 opinion, Dr. Man believed that the medical problems for which he had treated Mr. Absyed "preclude him from performing any full-time work at any exertion level, including the sedentary level."[304] Dr. Man identified severe depression, cirrhosis of the liver, and spinal stenosis as Mr. Absyed's primary impairments.[305] Dr. Man also indicated that Mr. Absyed

---

[303] AR 26, 30.

[304] AR 830. The "sedentary level," as defined on the form (by the SSA), includes "lifting no more than 10 pounds, sitting for 6 hours in an 8-hour work day, and standing/walking for 2 hours in an 8-hour work day." *Id.*

[305] *Id.*

could, "[a]t one time, without rest or support," sit indefinitely and stand and/or walk for 5–10 minutes.[306] Over an 8-hour period (*i.e.* a work day), Dr. Man stated that Mr. Absyed could sit for 4 hours and stand and/or walk for 2 hours.[307] He indicated that Mr. Absyed did not need to lie down or elevate his legs, and he identified no additional work limitations.[308] Dr. Man believed that Mr. Absyed had been disabled since March 2011.[309]

In Dr. Man's May 2014 opinion, he again indicated that Mr. Absyed's medical problems "preclude him from performing any full-time work at any exertion level."[310] This time, he listed depression, hand pain, and abdominal pain as Mr. Absyed's primary impairments.[311] He indicated that Mr. Absyed could, "[a]t one time, without rest or support," sit for several hours and stand and/or walk for several hours.[312] And, over an 8-hour period, Dr. Man believed that Mr. Absyed could sit for several hours and stand and/or walk for several hours.[313] Dr. Man again indicated that Mr. Absyed need not lie down or elevate his legs, but this time noted that Mr. Absyed had an additional work limitation concerning the use of his hands.[314] Dr. Man believed that Mr. Absyed had been disabled since June 2013.[315]

The ALJ assigned "limited weight" to Dr. Man's two opinions.[316] The ALJ "note[d] that Dr. Man's medical source statements are vague and inconsistent with each other."[317] The ALJ indicated that "[i]f [he] were going to give significant weight to either statement, [he] would give it to the more recent one [from May 2014], since it reflects [Mr. Absyed's] functioning after his

---

[306] *Id.*

[307] *Id.*

[308] *Id.*

[309] *Id.*

[310] AR 939.

[311] *Id.*

[312] *Id.*

[313] *Id.*

[314] *Id.*

[315] *Id.*

[316] AR 30.

[317] *Id.*

United States District Court
Northern District of California

Hepatitis C became undetectable."[318] The ALJ did not give any additional reasons for assigning limited weight to Dr. Man's opinions. The ALJ did, however, give significant weight to "the DDS medical consultants' opinion that [Mr. Absyed] would have limitations consistent with a restricted range of light work."[319] The ALJ reasoned that the DDS consultants' opinions "are consistent with [Mr. Absyed's] intermittent complaints, the clinical findings, the diagnostic findings, and the claimant's successful Interferon treatment."[320]

Because the DDS consultants' opinions contradicted Dr. Man's opinions — they said he could perform light work whereas Dr. Man said he could not — the court reviews the ALJ's determination on the more deferential "substantial evidence" standard to ensure that the decision was based on "specific and legitimate reasons supported by substantial evidence in the record," rather than on the "clear and convincing" evidence standard for "uncontradicted" medical evidence. *See Garrison*, 759 F.3d at 1012; *Ryan*, 528 F.3d at 1198. But, under that more deferential standard, the ALJ did not give specific and legitimate reasons supported by substantial evidence to give limited weight to Dr. Man's two opinions.

First, the ALJ did not sufficiently explain why Dr. Man's opinions are vague and inconsistent. The Commissioner argues that the opinions' inconsistency and vagueness is "readily apparent on the faces of the questionnaires."[321] There are indeed some differences (potential inconsistencies) in the two forms. For example, Dr. Man identified different primary impairments: in January, he identified severe depression, cirrhosis of the liver, and spinal stenosis;[322] in May, he identified depression, hand pain, and abdominal pain.[323] He also reported differently Mr. Absyed's ability to sit, stand, and walk: in January, Mr. Absyed could sit indefinitely and stand and/or walk for 5–10

---

[318] *Id.*

[319] *Id.*

[320] *Id.*

[321] *See* Cross-Motion for Summary Judgment at 10.

[322] AR 830.

[323] AR 939.

United States District Court
Northern District of California

United States District Court
Northern District of California

minutes;[324] in May, he could sit for several hours and stand and/or walk for several hours.[325] Dr. Man additionally identified different disability onset dates: March 2011 and June 2013.[326]

But there are consistencies: in both opinions, Dr. Man felt that Mr. Absyed's medical problems "preclude him from performing any full-time work at any exertion level, including the sedentary level."[327] And, over an 8-hour period (*i.e.* a work day), Dr. Man stated in January that Mr. Absyed could sit for 4 hours, and stand and/or walk for 2 hours; in May, he said that Mr. Absyed could sit for several hours, and stand and/or walk for several hours.[328] These statements — the difference between 2, 4, and "several" hours — are not necessarily inconsistent.

The ALJ did not, however, discuss these similarities and differences. He instead simply stated that the two opinions are inconsistent and vague. The court thus cannot tell if the ALJ properly discredited the opinions in their entirety or portions thereof, and whether that determination was in fact supported by substantial evidence in the record. For example, there is evidence that Mr. Absyed could not work — Drs. Bhaskar, Friduss, Ready, and Man multiple times noted or extended Mr. Absyed's work-disability status.[329] Indeed, in July 2013, Dr. Man reported that "[d]ue to [Mr. Absyed's] continuing fatigue after hep[atitis] C treatment, [and] chronic abdominal wall pain," he felt that Mr. Absyed was "disable[d] for the time being, perhaps long term."[330] There is also evidence that he experienced abdominal pain, cirrhosis, depression, spinal stenosis, and hand or arm pain and weakness — all conditions listed on Dr. Man's opinions.[331] This evidence supports Dr. Man's opinions, and, without more from the ALJ, it is unclear if limited weight to Dr. Man's opinions is in fact supported by substantial evidence.

---

[324] AR 830.

[325] AR 939.

[326] AR 830, 939.

[327] AR 830, 939.

[328] *Id.*

[329] *See* AR 267–68, 269–70, 285–86, 340, 417–18, 639, 646–47, 777.

[330] AR 777.

[331] *See, e.g.*, AR 248, 256, 335, 416, 438, 486, 599–600, 636, 694, 777, 788, 811.

1    Second, relatedly, the ALJ did not expressly evaluate Dr. Man's opinions in the context of the

2    entire medical record. In fact, the ALJ did not even compare Dr. Man's own treatment notes to

3    evaluate the January and May 2014 opinions. *See Garrison*, 759 F.3d at 1013 (noting that the

4    ALJ's errors were egregious and important where, among other things, she did not (1) "explicitly

5    compare [a treating doctor's testimony] to other medical evidence" and (2) did not recognize that a

6    check-box form questionnaire was "based on significant experience with [the claimant] and

7    supported by numerous records"). The Commissioner argues that "the ALJ rejected Dr. Man's

8    opinions because they were inconsistent with evidence from [Mr. Absyed's] other treating

9    physicians whose examination revealed a significant level of functioning."[332] But the ALJ plainly

10   did not: the only stated reason for rejecting Dr. Man's opinions was that they were vague and

11   inconsistent.[333] To the extent that the Commissioner seeks to add to or infer from the ALJ's

12   reasoning, the court cannot accept such *post-hoc* rationalizations. *See Bray v. Comm'r of Soc. Sec.*

13   *Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law

14   require [courts] to review the ALJ's decision based on the reasoning and factual findings offered

15   by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have

16   been thinking.").

17    The Commissioner also argues that, among the ALJ's reasons for discrediting Dr. Man's

18   opinion, "State agency reviewing physician Sadda V. Reddy, M.D., evaluated the record before

19   the ALJ and starkly disagreed with Dr. Man's functional assessment."[334] But, again, the ALJ did

20   not say that this was a reason for giving limited weight to Dr. Man's opinions and the court cannot

21   accept *post-hoc* rationalizations. *See Bray*, 554 F.3d at 1225. And, in any event, "[t]he opinion of a

22   nonexamining medical advisor cannot by itself constitute substantial evidence that justifies the

23   rejection of an examining or treating physician." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d

24   595, 602 (9th Cir. 1999). So although the ALJ gave Dr. Reddy's opinion "significant weight" it

25   does not constitute substantial evidence to support the limited weight given to Dr. Man's opinions.

26   ───────────────

27   [332] Cross-Motion for Summary Judgment at 11–12.

     [333] *See* AR 830.

28   [334] *See* Cross-Motion for Summary Judgment at 13.

1      The ALJ accordingly erred by failing to: (1) explain how and why Dr. Man's opinions were

2 "vague and inconsistent" — the only stated reason for giving them limited weight; and (2)

3 consider those opinions in the context of the medical evidence, including Dr. Man's treatment

4 notes.

5

6     **3.2  The ALJ Erred in His Adverse Credibility Finding**

7      The second issue is whether the ALJ properly evaluated Mr. Absyed's testimony and found it

8 "not entirely credible."[335]

9      In assessing a claimant's credibility, an ALJ must make two determinations. *Garrison*, 759

10 F.3d at 1014. "'First, the ALJ must determine whether the claimant has presented objective

11 medical evidence of an underlying impairment which could reasonably be expected to produce the

12 pain or other symptoms alleged.'" *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36

13 (9th Cir. 2007) (internal quotations omitted)). Second, if the claimant has produced that evidence,

14 and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing

15 reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms.

16 *Id.* at 1014–15 (quoting *Smolen*, 80 F.3d at 1281). In order to have meaningful appellate review,

17 the ALJ must explain its reasoning and "*specifically identify* the testimony [from a claimant] she

18 or he finds not to be credible and . . . explain what evidence undermines the testimony." *Treichler*

19 *v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102, 1103 (9th Cir. 2014) ("Credibility findings must

20 have support in the record, and hackneyed language seen universally in ALJ decisions adds

21 nothing.") (internal quotations omitted). "That means '[g]eneral findings are insufficient.'" *Id.* at

22 1102 (quoting *Lester*, 81 F.3d at 834); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002)

23 ("[T]he ALJ must make a credibility determination with findings sufficiently specific to permit the

24 court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.") (citing *Bunnell*

25 *v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc)). Moreover, the court will "review

26

27

28 [335] *See* AR 28; Motion for Summary Judgment at 21–25.

United States District Court
Northern District of California

1   only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ

2   on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

3       An ALJ must not reject a claimant's subjective complaints supported by "objective medical

4   evidence of an underlying impairment . . . based solely on a lack of medical evidence to fully

5   corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005)

6   (citing *Bunnell*, 947 F.2d at 345). In addition to truthfulness and inconsistencies, an ALJ may

7   consider: the nature, location, onset, duration, frequency, radiation, and intensity of any pain;

8   precipitating and aggravating factors (e.g., movement, activity, environmental conditions); type,

9   dosage, effectiveness, and adverse side-effects of any pain medication; treatment, other than

10  medication, for relief of pain; functional restrictions; and the claimant's daily activities. *Id.* (citing

11  *Bunnell*, 947 F.2d at 346).

12      Here, at the first step, the ALJ found that Mr. Absyed's "medically determinable impairments

13  could reasonably be expected to cause the alleged symptoms."[336] At the second step, the ALJ

14  considered Mr. Absyed's "statements concerning the intensity, persistence, and limiting effects of

15  these symptoms."[337] In doing so, the ALJ concluded that Mr. Absyed's statements "[were] not

16  entirely credible."[338] The ALJ based this determination on several credibility factors, including

17  Mr. Absyed's "intermittent complaints, the lack of corroborative clinical findings, the absence of

18  corroborative diagnostic findings, [Mr. Absyed's] disability-seeking behavior . . . , and [his]

19  receipt of routine and conservative treatment."[339]

20      The ALJ identified the elements of Mr. Absyed's testimony that he found not to be credible.

21  The ALJ found not credible Mr. Absyed's testimony concerning his: (1) memory loss, (2) inability

22  to stand or walk for more than 30 minutes, (3) inability to sit for more than 30 minutes, (4) ability

23  to lift only 5 pounds, (5) continuing pain near his liver and gallbladder, (6) fatigue, which requires

---

[336] AR 26, 28.

[337] *See id.*

[338] AR 28.

[339] AR 28–29.

him to lie down frequently, and (7) constant nausea and vomiting almost every day.[340] The ALJ provided reasons for rejecting this testimony.[341]

There are two issues with the ALJ's reasoning. First, the ALJ rejected much of Mr. Absyed's testimony based principally on an absence of corroborating objective medical evidence. For example, Mr. Absyed testified that he continued to experience memory loss and had "trouble getting his memory back."[342] The ALJ rejected this testimony because the record indicated that the memory loss was a short-term, non-severe side effect during Mr. Absyed's hepatitis C treatment.[343] To support his conclusion, the ALJ cited to the fact that none of Mr. Absyed's doctors referred him for neuropsychological testing and did not recommend Mr. Absyed take precautions, such as not driving.[344] Another example is Mr. Absyed's testimony that he can only lift 5 pounds.[345] The ALJ rejected this testimony because it was "not supported by the record."[346] The ALJ explained that Mr. Absyed complained only intermittently of "some right arm pain and weakness" and that he denied such symptoms in July 2013, that some providers noted (at most) slightly reduced motor strength but others reported normal strength, and that Mr. Absyed received only routine and conservative treatment.[347] This reasoning relies principally on the absence of objective medical findings in the record, but the ALJ may not reject a claimant's testimony "merely because [it is] not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001).

Second, the ALJ mischaracterized or read record evidence out of context. For example, the ALJ explained that because Mr. Absyed said he was doing "fine" in March 2013, it was evidence that the long-term pain he reported near his liver and gallbladder was not supported by the

---

[340] *See* AR 29–30.

[341] *Id.*

[342] AR 29.

[343] *Id.*

[344] *Id.*

[345] *Id.*

[346] *Id.*

[347] *Id.*

United States District Court
Northern District of California

evidence.[348] The treatment records, however, "must be viewed in light of the overall diagnostic record." *Ghanim*, 763 F.3d at 1164. When viewed in its entirety, the record shows that Mr. Absyed continued to suffer from the abdominal pain, even if there were some periods of occasional improvement. Mr. Absyed had consistently complained about the abdominal pain since July 2011.[349] The ALJ failed to mention that three days before Mr. Absyed reported he was "fine," he complained that he had abdominal pain.[350] And the ALJ further failed to note that even four months after he was "fine," Mr. Absyed again reported that he "still feels chronic abdominal pain."[351]

Similarly, the ALJ noted that despite Mr. Absyed's testimony that his "back problem" caused issues with working, he nevertheless declined spinal surgery.[352] However, the ALJ neglected to include the reason Mr. Absyed decided not to go undergo surgery — an increased risk of post-surgery complications. In fact, Mr. Absyed's testimony explaining why he made the decision not to have surgery was consistent with his surgeon's opinion that Mr. Absyed was at a higher risk for developing post-surgical complications due to his liver issues, but this was not mentioned in the ALJ's decision.[353] By implying that Mr. Absyed simply elected not to have surgery for his disability, without mentioning the physician's high-risk opinion as the reason for Mr. Absyed's decision, the ALJ further mischaracterized the record.

And again, the ALJ discredited Mr. Absyed's testimony about his memory loss because the ALJ believed it conflicted with the record and because Mr. Absyed "consistently denied mental health treatment or referrals."[354] While it is true that Mr. Absyed declined to "take anything else for depression," this is not inconsistent with his testimony and does not specifically concern

---

[348] AR 30.

[349] *See, e.g.*, AR 248, 256, 267, 327, 334–35, 430, 775, 777.

[350] AR 694.

[351] AR 775.

[352] AR 27, 29, 75.

[353] AR 74, 937.

[354] AR 29.

United States District Court
Northern District of California

memory loss.[355] The ALJ does not identify evidence that Mr. Absyed denied memory-loss treatment.

The ALJ thus gave some reasons for discrediting Mr. Absyed's testimony, but they largely relied on the absence of corroborative evidence — a factor insufficient on its own — and incorrect or incomplete statements of fact (at least in the context of the record as a whole). The ALJ must re-evaluate Mr. Absyed's testimony on remand.

## CONCLUSION

The court grants Mr. Absyed's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands the case for further proceedings consistent with the order.

**IT IS SO ORDERED.**

Dated: March 31, 2017

LAUREL BEELER
United States Magistrate Judge

---

[355] AR 601.